## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| RICHARD MELLEMA, TRUSTEE OF THE RICHARD MELLEMA TRUST, Derivatively on Behalf of Nominal Defendant NEOGENOMICS, INC., | ) ) ) ) ) | Case No. _____ |
| Plaintiff, | ) ) | JURY TRIAL DEMANDED |
| v. | ) ) ) | |
| DOUGLAS M. VANOORT, MARK W. MALLON, KATHRYN B. MCKENZIE, WILLIAM B. BONELLO, LYNN A. TETRAULT, ALISON L. HANNAH, BRUCE K. CROWTHER, MICHAEL A. KELLY, RACHEL A. STAHLER, STEPHEN M. KANOVSKY, DAVID J. DALY, KEVIN C. JOHNSON, RAYMOND R. HIPP, and STEVEN C. JONES, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) ) | |
| and | ) ) ) | |
| NEOGENOMICS, INC., | ) ) ) | |
| Nominal Defendant. | ) ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Richard Mellema, Trustee of the Richard Mellema Trust ("Plaintiff"), by and through his undersigned counsel, alleges the following based upon personal knowledge as to matters concerning himself, and upon information and belief as to all others based on, *inter alia*, the investigation of counsel, which includes review and analyses of: (a) the filings of NeoGenomics, Inc. ("NeoGenomics" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) news articles, press releases, conference call transcripts, analysts' reports, and other publicly available information concerning the Company; and (c) the

pleadings, Orders, and filings in the securities class action litigation captioned, *Goldenberg v. NeoGenomics, Inc.*, Case No. 1:22-cv-10314 (S.D.N.Y.) (the "Securities Action").

## NATURE OF THE ACTION

1.      This stockholder derivative action is brought on behalf of NeoGenomics against certain current and former Company officers and members of the Company's Board of Directors (the "Board") for breaches of their fiduciary duties in issuing, causing to be issued, or permitting the issuance of materially false and misleading public statements concerning the Company's business and finances, mainly the Company's portfolio of cancer testing services, during the period of February 27, 2020 to April 26, 2022 (the "Relevant Period").

2.      NeoGenomics operates a network of cancer-focused laboratories in the United States, Switzerland, and Singapore. The Company provides testing services to pathologists, oncologists, academic centers, hospital systems, pharmaceutical firms, integrated service delivery networks, and managed care organizations.

3.      The Company maintains a large portfolio of testing services, which includes Molecular and Next-Generation Sequencing ("NGS") testing. NGS testing panels test multiple genes of cancer simultaneously, which allows for faster treatment decisions for patients compared to a series of single-gene molecular tests being ordered sequentially. NGS tests are one of the fastest growing testing areas in the medical field.

4.      As set forth below, throughout the Relevant Period, the Individual Defendants (defined below) and the Company, misled the investing public, including the Company's shareholders, by misrepresenting the success and financials of the Company, specifically the success of the portfolio of tests offered by NeoGenomics.

5.      The Individual Defendants caused and/or permitted the Company to repeatedly

state throughout the Relevant Period that NeoGenomics was uniquely positioned as a "one-stop-shop" for pathologists in the department of cancer testing. The Individual Defendants also caused and/or permitted NeoGeonomics to tout its "comprehensive menu" of cancer testing, specifically claiming that the Company could "meet all of their [customers] oncology testing needs," and labeled the Company as having a "sustainable competitive advantage[]." More specifically, the Company touted their NGS testing, stating that NeoGeonomics maintains "one of the broadest Molecular and Next Generation Sequencing test menus in the world."

6.       Additionally, during the Relevant Period, the Individual Defendants caused and/or permitted NeoGenomics to continuously misrepresent the financial success of the Company. The Company asserted that it was profitable, and was in a position to remain profitable, due to the "fixed nature of many of [the Company's] laboratory costs."

7.       Furthermore, throughout the Relevant Period the Individual Defendants caused and/or permitted the Company to tout the success of NeoGenomics' efforts to maintain compliance with federal and state regulations. The Company asserted that it maintained a "robust Compliance Program" and highlighted the Board's Compliance Committee's efforts.

8.       However, these aforementioned statements were materially false and misleading because: (i) NeoGenomics was not a "one-stop-shop" for cancer testing because it did not actually offer a "comprehensive menu" of tests because the testing market was changing and customers preferred other forms of tests; (ii) the Company's costs were not actually "fixed" because, in reality, NeoGenomics needed to spend money to expand their testing menu to accommodate their customers by offering more complex customized testing as the market expanded; and (iii) NeoGenomics' compliance program was not as successful and robust as asserted, as evinced by the investigations into the Company for violations of federal healthcare laws and regulations

related to fraud, waste, and abuse.

9.      On November 4, 2021, the truth began to emerge when the Company held its conference call for the third-quarter 2021 financial results (the "3Q 2021 Earnings Call"). During the 3Q 2021 Earnings Call, the Company's Chief Financial Officer ("CFO"), Defendant Kathryn B. McKenzie ("McKenzie"), announced that the Company was "voluntarily conducting an internal investigation, with the assistance of outside counsel, that focuses on the compliance of certain consulting and service agreements with federal healthcare laws and regulations." Defendant McKenzie also disclosed that the Company "accrued a reserve of $10.5 million for potential damage and liabilities associated with the federal healthcare program revenue received spanning multiple years."

10.     On this news, NeoGenomics' stock price declined $8.18 per share, or approximately 17.6%, to close at $38.35 per share on November 4, 2021.

11.     Then, on March 28, 2022, the Company issued a press release announcing that Defendant Mark W. Mallon ("Mallon") would be stepping down as NeoGenomics' Chief Executive Officer ("CEO"). This press release also revealed that NeoGenomics was expecting disappointing financial results for the first quarter of 2022, stating, "[t]he Company currently expects revenue for Q1 2022 may be below the low end of its prior guidance of $118 - $120 million and EBITDA for Q1 2022 will be below the low end of its prior guidance of $(15) - $(12) million."

12.     On this news, NeoGenomics' stock price dropped $5.30 per share, or approximately 29.8%, to close at $12.49 per share on March 29, 2022.

13.     On April 27, 2022, the Company issued a press release announcing the first-quarter 2022 financial results. The press release stated that "[c]onsolidated gross profit for the first quarter of 2022 was $38.2 million, a decrease of 8.0% compared to the first quarter of 2021." The press

release further revealed that "[o]perating expenses increased by $34 million, or $59%, compared to the first quarter of 2021."

14.     Also on April 27, 2022, the Company held a conference call to discuss NeoGenomics' first-quarter 2022 financial results (the "1Q 2022 Earnings Call"). During the 1Q 2022 Earnings Call, the Company's officers discussed what they believed to be the cause of the decrease in the Company's financial performance. Specifically, the Company's new CFO, William B. Bonello ("Bonello"), gave two primary reasons for the decrease, stating "[f]irst, our test mix is weighted to legacy modalities and disease-specific NGS offerings while the market is moving towards larger, more comprehensive panels" and "[s]econd, operational challenges have made it difficult to add new business at our historical rates."

15.     On this news, NeoGenomics' stock price dropped $0.41 per share, or approximately 3.8%, to close at $10.44 per share on April 27, 2022.

16.     On December 6, 2022, purchasers of Company stock filed the Securities Action against the Company and Douglas M. VanOort ("VanOort"), Mallon, McKenzie, and Bonello (collectively, the "Securities Defendants"). The Securities Action is pending in this Court.

17.     In addition to the costs and expenses related to defending itself against the Securities Action and exposing NeoGenomics to potential liability for class-wide damages, the Individual Defendants' misconduct has subjected the Company to costs incurred in connection with NeoGenomics' internal investigation, potential governmental fines and penaltines, wasting of corporate assets, and enabled the Individual Defendants who were improperly overcompensated by the Company, to unjustly enrich themselves.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section

27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Nominal Defendant NeoGenomics conducts business in this District, and is authorized to, and does, provide diagnostic laboratory services in the State of New York, including this District.

## PARTIES

*Plaintiff*

23.     Plaintiff is, and has been at all relevant times, a continuous shareholder of NeoGenomics since May 22, 2014.

*Nominal Defendant*

24.     Nominal Defendant NeoGenomics is incorporated under the laws of Nevada with its principal executive offices located in Fort Myers, Florida.  NeoGenomics' common stock trades on the NASDAQ under the ticker symbol "NEO." NeoGenomics is licensed under the Clinical Laboratory Improvement Amendment of of 1988 and is authorized to, and does, provide diagnostic laboratory services in the State of New York, among others.

*Individual Defendants*

6

25.     Defendant VanOort served as the Company's CEO and as Chairman of the Board from October 2009 until his retirement on April 19, 2021. According to the Company's public filings, VanOort received $4,122,039 in 2020 in compensation from the Company, and $7,227,002 in 2021.

26.     Defendant Mallon served as CEO of the Company and as a member of the Board from April 2021 until his resignation on March 28, 2022. According to the Company's public filings, Mallon received $11,479,855 in 2021 in compensation from the Company, and $7,695,856 in 2022. In connection with Defendant Mallon's resignation, Mallon and the Company entered into a separation agreement on March 28, 2022 (the "Separation Agreement"). Pursuant to the Separation Agreement, Defendant Mallon the Company agreed to, among other things, pay Mallon $1,550,000 in connection with his termination, which accounted for twelve months of his base salary and Mallon's target annual bonus.

27.     Defendant McKenzie has served as the Company's Chief Sustainability and Risk Officer since January 2022. Defendant McKenzie previously served as the Company's CFO from February 2020 until December 31, 2021, and as the Company's Vice President of Finance and Chief Accounting Officer from October 2017 until February 2020. According to the Company's public filings, McKenzie received $1,034,616 in 2020 in compensation from the Company, and $2,793,484 in 2021.

28.     Defendant Bonello served as CFO of the Company from January 2022 until December 7, 2022. According to the Company's public flings, Bonello received $1,552,381 in 2022 in compensation from the Company.

29.     Defendant Lynn A. Tetrault ("Tetrault") has served as a director of the Company since June 2015 and as Chair of the Board since October 2021. Defendant Tetrault previously

served as interim CEO from May 12, 2022 until August 15, 2022, and as Lead Independent Director of the Board from July 2020 until October 2021. Tetrault also serves as a member of the Board's Culture & Compensation Committee and Nominating and Corporate Governance Committee. According to the Company's public filings, Tetrault received $186,250 in 2020 in compensation from the Company, $327,668 in 2021, and $2,071,184 in 2022.

30.     Defendant Alison L. Hannah ("Hannah") has served as a director of the Company since June 2015. Hannah also serves as Chair of the Board's Compliance Committee and as a member of the Board's Nominating and Corporate Governance Committee. According to the Company's public filings, Hannah received $171,500 in 2020 in compensation from the Company, $241,736 in 2021, and $245,000 in 2022.

31.     Defendant Bruce K. Crowther ("Crowther") has served as a director of the Company since October 2014. Crowther also serves as Chair of the Board's Culture and Compensation Committee and as a member of the Board's Audit and Finance Committee. According to the Company's public filings, Crowther received $180,000 in 2020 in compensation from the Company, $248,235 in 2021, and $253,271 in 2022.

32.     Defendant Michael A. Kelly ("Kelly") has served as a director of the Company since July 2020. Kelly also serves as Chair of the Board's Audit and Finance Committee and as a member of the Board's Culture and Compensation Committee. According to the Company's public filings, Kelly received $109,284 in 2020 in compensation from the Company, $246,058 in 2021, and $269,002 in 2022.

33.     Defendant Rachel A. Stahler ("Stahler") has served as a director of the Company since May 2020. Stahler also serves as a member of the Board's Nominating and Corporate Governance Committee and Audit & Finance Committee. According to the Company's public

filings, Stahler received $130,137 in 2020 in compensation from the Company, $241,250 in 2021, and $245,000 in 2022.

34.     Defendant Stephen M. Kanovsky ("Kanovsky") has served as a director of the Company since July 2017. Kanovsky also serves as Chair of the Board's Nominating and Corporate Governance Committee and as a member of the Board's Compliance Committee. According to the Company's public filings, Kanovsky received $172,500 in 2020 in compensation from the Company, $243,125 in 2021, and $245,000 in 2022.

35.     Defendant David J. Daly ("Daly") served as a director of the Company from November 2021 until January 19, 2023. Daly also served as a member of the Board's Compliance Committee and Culture and Compensation Committee. According to the Company's public filings, Daly received $100,600 in 2021 in compensation from the Company, and $248,931 in 2022.

36.     Defendant Kevin C. Johnson ("Johnson") served as a director of the Company from October 2010 until January 17, 2022. Johnson also served as a member of the Board's Culture and Compensation Committee and Compliance Committee. According to the Company's public filings, Johnson received $168,125 in 2020 in compensation from the Company, and $240,625 in 2021.

37.     Defendant Raymond R. Hipp ("Hipp") served as a director of the Company from February 2011 until May 27, 2021. Hipp also served as Chair of the Board's Audit Committee and as a member of the Board's Culture and Compensation Committee. According to the Company's public filings, Hipp received $182,500 in 2020 in compensation from the Company.

38.     Defendant Steven C. Jones ("Jones") served as a director of the Company from October 2003 until May 27, 2021. Jones also served as a member of the Board's Compliance

Committee. According to the Company's public filings, Jones received $195,363 in 2020 in compensation from the Company.

39.     Defendants referenced in paragraphs 25 through 38 are referred to herein as the "Individual Defendants," and, with NeoGenomics, the "Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

40.     By reason of their positions as officers and directors of NeoGenomics, and because of their ability to control the business and corporate affairs of NeoGenomics, the Individual Defendants owed NeoGenomics and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage NeoGenomics in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of NeoGenomics and its shareholders so as to benefit all shareholders equally.

41.     Each director and officer of the Company owes to NeoGenomics and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

42.     The Individual Defendants, because of their positions of control and authority as officer and directors of NeoGenomics, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

43.     To discharge their duties, the officers and directors of NeoGenomics were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

44.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed the Company and its shareholders the highest fiduciary duties of loyalty, good faith,

and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officer of NeoGenomics, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

45.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations. The Individual Defendants also had a fiduciary duty to disclose the material information necessary to prevent other public statements, including those in its regulatory filings with the SEC, from being materially false, so that the market price of the Company's common stock was based upon truthful, accurate, and fairly presented information.

46.      To discharge their duties, the officers and directors of NeoGenomics were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.   By virtue of such duties, the officers and directors of NeoGenomics were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada and the United States, and pursuant

to NeoGenomics' own Code of Business Conduct and Ethics (the "Code of Conduct");

   (b)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

   (c)   remain informed as to how NeoGenomics conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

   (d)   establish and maintain systematic and accurate records and reports of the business and internal affairs of NeoGenomics and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

   (e)   maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that NeoGenomics' operations would comply with all applicable laws and NeoGenomics' public statements, financial statements and regulatory filings were accurate;

   (f)   adequately monitor the Company's officers and employees to ensure their public statements about the Company were complete and accurate;

   (g)   refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

   (h)   examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth

above.

47.     Each of the Individual Defendants further owed to NeoGenomics and its shareholders the duty of loyalty requiring that they favor the interests of NeoGenomics and its shareholders over their own while conducting the affairs of the Company, and that the Individual Defendants refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

48.     Because of their advisory, executive, managerial, and directorial positions with NeoGenomics, each of the Individual Defendants had access to adverse, non-public information about the Company.

49.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by NeoGenomics.

## NEOGENOMICS'S CODE OF BUSINESS CONDUCT AND ETHICS

50.     NeoGenomics' Code of Conduct applies to all directors, officers and employees and was adopted to "promote honest and ethical conduct, full, fair, accurate, timely, and understandable disclosure in the Company's periodic reports, and compliance with applicable laws, rules, and regulations ("Applicable Laws") by the Company's directors, officers and employees."

51.     In a section titled, "Compliance with Applicable Laws," the Code of Conduct states in relevant part:

> We are committed to full compliance with all Applicable Laws, including those governmental laws, rules and regulations pertaining to, but not limited to the following:
>
> - Prohibiting any illegal payments, gifts or gratuities to any government or government employee;

- Prohibiting the unauthorized use, reproduction, or distribution of any third party's trade secrets, copyrighted information or confidential information;

- Business arrangements with our clients, including providing gifts to such clients and ensuring that any discounts are at fair market value and negotiated at arms' length consistent with the Company's policies and review and approval processes; and

- Fair and accurate disclosure under applicable securities laws, rules and regulations.

52.     In a section titled "Full, Fair, Accurate, Timely, and Understandable Disclosure,"

the Code of Conduct states:

> We are committed to providing our stockholders and investors with full, fair, accurate, timely and understandable disclosure in the reports that we file with the Securities and Exchange Commission. You must take all steps available to assist the Company in these responsibilities. To this end, our Directors, Officers and Employees shall:

- Not make false or misleading entries in our books and records for any reason;

- Notify our Chief Financial Officer if they become aware of any unreported or questionable transaction;

- Notify our Chief Financial Officer of any ownership interests in any companies with which the Company is doing business or pursuing as an acquisition candidate;

- Maintain a system of internal accounting controls that will provide reasonable assurances to management that all transactions are properly recorded;

- Prohibit the establishment of any undisclosed or unrecorded funds or assets; and

- Maintain a system of internal controls that will provide reasonable assurances to our management that material information about the Company is made known to management, particularly during the periods in which our periodic reports are being prepared.

53.     In a section titled "Special Ethical Considerations for Officers and Employees with

Financial Reporting Responsibilities," the Code of Conduct states:

As used in this Code, the term Financial Employees means executives and all managers with accounting or financial reporting responsibilities or related disclosure responsibilities, including but not limited to the Company's Chief Executive Officer, Chief Financial Officer, Executive Vice President of Finance, Principal Accounting Officer, controller and other persons performing similar functions. In performing their duties, our Financial Employees must adhere to and advocate to the best of their ability the following principles governing their professional and ethical conduct:

- Act with honesty and integrity, including the ethical handling of actual or apparent conflicts of interests between personal and professional relationships;

- Comply with all applicable laws, rules and regulations of federal, state, provincial and local governments, and other appropriate private and public regulatory agencies applicable to the performance of his or her duties with the Company;

- Comply with the Company's established accounting procedures, system of internal controls and generally accepted accounting principles;

- Promptly disclose to the Audit Committee or Compliance Committee any significant deficiencies in the design or operation of the Company's internal controls impacting the collection and reporting of financial data and any fraud involving management or other employees who play a significant role in the Company's internal controls;

- Provide information that is accurate, complete, objective, relevant, timely and understandable to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, governmental agencies, including the Securities and Exchange Commission, and in other public communications made by the Company; and

- Comply with all applicable regulations of any stock exchange on which the Company's securities are then listed.

## **NEOGENOMICS' AUDIT COMMITTEE CHARTER**

54.     The Company's Audit and Finance Committee Charter (the "Audit Committee Charter") states that the purpose of the Audit and Finance Committee is to assist the Board in its oversight of:

(i) The quality and integrity of the Corporation's financial statements and other

financial information provided by the Corporation to the stockholders, the public, the stock exchange and others, including but not limited to, in coordination with the Nominating and Corporate Governance and Culture and Compensation Committees of the Board, the Corporation's Environmental, Social and Governance ("ESG") reports and disclosures;

(ii) The Corporation's compliance with legal and regulatory requirements;

(iii) The Corporation's enterprise risks, including but not limited to risks relating to the Corporation's information technology use and protection, data governance, privacy, and cybersecurity, and the Corporation's strategy to mitigate such risks;

(iv) The independent auditor's qualifications and independence;

(v) The performance of the Corporation's internal audit function and independent auditors;

(vi) The preparation of the report required by the Committee pursuant to the rules of the Securities and Exchange Commission (the "SEC") for inclusion in the annual proxy statement; and

(vii) Working in coordination with the Compliance Committee of the Board, the implementation and effectiveness of the Corporation's ethics and compliance program.

55.     In a section titled "Responsibilities and Duties," the Audit Committee Charter states that:

The Committee, in discharging its oversight role, is empowered to study or investigate any matter of interest or concern that the Committee deems appropriate. In this regard, the Committee shall have the authority to retain outside legal, accounting or other advisors for this purpose, including the authority to approve the fees payable to such advisors and any other terms of retention.

The Committee shall be given full access to the Corporation's Management, ethics and compliance personnel, Board, corporate executives and independent accountants, as necessary, to carry out these responsibilities. While acting within the scope of its stated purpose, the Committee shall have all the authority of the Board.

Notwithstanding the foregoing, the Committee is not responsible for certifying the Corporation's financial statements or guaranteeing the independent auditor's report. The fundamental responsibility for the Corporation's financial statements and disclosures rests with management and the independent auditors.

56.     The "Responsibilities and Duties" section of the Audit Committee Charter goes on to state, in relevant part:

Documents/Reports Review

1. Meet with management and the independent auditors to review and discuss, prior to public dissemination, the Corporation's annual audited financial statements and quarterly financial statements, including the Corporation's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Company's annual report on Form 10-K and quarterly reports on Form 10-Q, and discuss with the independent auditors the matters required to be discussed by Statement of Auditing Standards No. 61 and the matters in the written disclosures required by Independence Standards Board Standard No. 1.

2. Report to the Board whether, based on its discussions with management and the independent auditor, it recommends to the Board that the most recent year's audited financial statements be included in the Corporation's Annual Report on Form 10-K to be filed with the SEC.

3. Review and discuss with management and the independent auditors the Corporation's earnings press releases (paying particular attention to the use of any "pro forma" or "adjusted" nonGAAP information).

4. Review and discuss with management and the independent auditors financial information and earnings guidance provided to analysts and rating agencies. The Committee's discussion in this regard may be general in nature (i.e., discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each instance in which the Corporation may provide earnings guidance.

5. In consultation with management, the independent auditors and the internal audit department, periodically review the adequacy of the Company's disclosure controls and procedures and approve any significant changes thereto. . . .

Financial Reporting Process

10. In consultation with the independent auditors and management, review the integrity of the Corporation's financial reporting processes, both internal and external. In connection therewith, the Committee should obtain and discuss with management and the independent auditor reports from management and the independent auditor regarding: (i) all critical accounting policies and practices to be used by the Corporation; (ii) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including all alternative treatments of financial information within generally

accepted accounting principles that have been discussed with the Corporation's management, the ramifications of the use of the alternative disclosures and treatments and the treatment preferred by the independent auditor; (iii) effects of changes in accounting standards that may materially affect the Corporation's financial reporting practices; (iv) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Corporation's selection or application of accounting principles; (v) the integrity of the Corporation's financial reporting practices and the adequacy and effectiveness of internal controls, including a review of significant findings identified by the independent auditors , management's responsiveness to such recommendations and any specific audit steps adopted in light of material control deficiencies and (vi) any other material written communications between the independent auditor and the Corporation's management.

11. Review periodically the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Corporation.

12. Review with the independent auditor (i) any audit problems or other difficulties encountered by the auditor in the course of the audit process, including any restrictions on the scope of the independent auditor's activities or on access to requested information and any significant disagreements with management and (ii) management's responses to such matters. Without excluding other possibilities, the Committee may wish to review with the independent auditor (i) any accounting adjustments that were noted or proposed by the auditor but were "passed" (as immaterial or otherwise), (ii) any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement and (iii) any "management" or "internal control" letter issued or proposed to be issued by the independent auditor to the Corporation. The review should also include discussion of the responsibilities, budget and staffing of the corporation's internal audit function.

Legal Compliance/General

13. Review periodically, with the Corporation's legal counsel, any legal matter that could have a significant impact on the Corporation's financial statements and any material inquiries or reports received from regulatory or governmental agencies.

14. In coordination with the Compliance Committee of the Board, review periodically the content and operation of the Corporation's ethics and compliance program and the Code of Business Ethics.

15. Discuss with management and the independent auditors at least annually the Corporation's guidelines and policies with respect to enterprise risk assessment and risk management, including but not limited to risks relating to the Corporation's information technology use and protection, data governance, privacy, and cybersecurity, and the Corporation's strategy to mitigate such risks. The Committee

should discuss the Corporation's major financial risk exposures and the overall steps management has taken to monitor and control such exposures; however, the Committee is not responsible for detailed review of financial risk exposure and management, which responsibility has been delegated to another committee of the Board. . . .

Reports

20. Prepare the Committee's report required to be included in the Corporation's annual proxy statement, pursuant to and in accordance with applicable rules and regulations of the SEC.

21. Report regularly to the full Board including:

(i) with respect to any issues that arise with respect to the quality or integrity of the Corporation's financial statements, including the Corporation's compliance with legal or regulatory requirements, and the performance and independence of the Corporation's independent auditors;

(ii) following all meetings of the Committee; and

(iii) with respect to such other matters as are relevant to the Committee's discharge of its responsibilities. The report to the Board may take the form of an oral report by the Chair of the Committee or any other member of the Committee designated by the Committee to make such report. . . .

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

57.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

58.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

59.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

60.     Each of the Individual Defendants aided, abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

61.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and NeoGenomics and was at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

*Background*

62.     NeoGenomics operates a network of cancer-focused testing laboratories in the United States, Europe, and Asia.

63.     The Company operates in two business segments: (1) the Clinical Services Segment; and (2) the Pharma Services Segment. The Clinical Services Segment offers various

clinical testing services to community-based pathology practices, hospital pathology labs and academic centers with reimbursement from various payers including client direct billing, commercial insurance, Medicate, and other government payers, and patients. The Pharma Services Segment supports pharmaceutical firms in their drug development programs by supporting various clinical trials and research. In 2021, the Clinical Services Segment accounted 83% of NeoGenomics' revenue and the Pharma Services Segment accounted for 17%. In 2022, the Clinical Services and Pharma Services Segments accounted for 82% and 18% of the Company's revenue, respectively.

64.     NeoGenomics maintains a portfolio of different testing services. Among the testing services offered by the Company is NGS testing. NGS testing panels test for multiple genes of cancer simultaneously, allowing for faster treatment decisions for patients compared to a series of classic single-gene molecular tests. According to the Company's website, NGS testing panels offer "the most comprehensive combination of tests spanning from single-gene, disease-specific and broad reach tumor profiles in tissue and plasma specimens, in addition to bone marrow and peripheral blood samples." NeoGenomics has asserted itself as a "leading provider" of NGS testing.

### The Individual Defendants' False and Misleading Statements

65.     Throughout the Relevant Period, the Individual Defendants caused and/or permitted the Company to continuously tout its success, particularly the success of NeoGeonomics' "comprehensive suite" of testing services.

66.     On February 27, 2020, the Company issued a press release announcing a 40% revenue growth for the fourth quarter of 2019. In that press release, Defendant VanOort was quoted as stating:

"Our fourth quarter performance concludes a very successful year for NeoGenomics in which our company grew by nearly 50% and our competitive position strengthened dramatically", said Douglas M. VanOort, the Company's Chairman and CEO.

"In the fourth quarter, our Clinical Services Division once again reported excellent volume growth of 27% driven by market share gains and the addition of Genoptix. We are particularly pleased that combined molecular and Next Generation Sequencing test volume continued to grow at rates approximating 50%, and that average-revenue-per-test improved by over 10% from last year. Pharma Services Division growth was also excellent with strong revenue gains, a record amount of newly-signed contracts, and a current backlog of approximately $130 million in signed contracts."

"Perhaps more importantly, we are very excited about the opportunities in front of us. We've made significant investments in a variety of growth initiatives over the past year, including our recent acquisition of the Oncology Division of Human Longevity, Inc., investments in Next Generation Sequencing, and Informatics. We believe that NeoGenomics has significant, sustainable competitive advantages and is well positioned for growth in each of the markets in which we operate."

67.    Also on February 27, 2020, the Company held a conference call to discuss the fourth-quarter and full-year 2019 financial results (the "4Q 2019 Earnings Call"). During the 4Q 2019 Earnings Call, Defendant VanOort touted the success of the Company's NGS testing. Specifically, Defendant VanOort stated:

We have really restructured in some respects our NGS panels, and we think they are very, very high-quality panels. We continue to make improvements in them in terms of the number of genes and in our reporting capabilities, and the marketplace is reacting very favorably to that. So our next-generation sequencing panels in the clinical business should continue to fuel growth.

68.    Then, on February 28, 2020, the Company filed its annual report, for the fiscal year ended December 31, 2019, on Form 10-K with the SEC (the "2019 10-K"). The Company again boasted the success of NeoGenomics' NGS testing, stating:

NeoGenomics is a leading provider of Molecular and next-generation sequencing ("NGS") testing. These tests are interpreted by NeoGenomics' team of Molecular experts and are often ordered in conjunction with other testing modalities. NGS panels are one of our fastest growing testing areas and clients can often receive a significant amount of biomarker information from very limited samples. These

comprehensive panels can allow for faster treatment decisions for patients as compared to a series of single-gene molecular tests being ordered sequentially. NeoGenomics has one of the broadest Molecular menus in the industry and our targeted NeoTYPE panels include genes relevant to a particular cancer type, as well as other complementary tests such as immunohistochemistry and FISH. ***This comprehensive menu means that NeoGenomics can be a one-stop-shop for our clients who can get all of their oncology testing needs satisfied by our laboratory. This is attractive to our clients as patient samples do not need to be split and then managed across several laboratories. NeoGenomics expects our Molecular laboratory and NGS capabilities to be a key growth driver in the coming years.***

(Emphasis added).

69.     The 2019 10-K went on to say "[w]e believe we have one of the broadest Molecular and Next Generation Sequencing test menus in the world. Clients have the ability to order single gene molecular tests, targeted NeoTYPE panels that include the relevant actionable genes for a particular cancer type as well as large NGS panels."

70.     Further, the 2019 10-K presented NeoGenomics as a uniquely positioned company. Specifically, the 2019 10-K included a section titled "Competitive Strengths," where the Company listed "Turnaround Times," "World-class Medical and Scientific Team," "Innovative Service Offerings," and "National Direct Sales Force" as its competitive strengths. Under the "Innovative Service Offerings" section, the 2019 10-K stated:

We believe we have one of the broadest Molecular and Next Generation Sequencing test menus in the world. Clients have the ability to order single gene molecular tests, targeted NeoTYPE panels that include the relevant actionable genes for a particular cancer type as well as large NGS panels. Our Pharma Services Division offers a full range of sequencing testing including whole exome sequencing. Our menu enables us to be a true one-stop-shop for our clients as we can meet all of their oncology testing needs.

71.     Additionally, the 2019 10-K stated that NeoGeonomics "superior testing technologies and instrumentation, laboratory information system, client education programs and broad domestic and growing international presence also differentiates NeoGenomics from its competitors."

23

72.     The 2019 10-K highlighted the Company's efforts to comply with government regulations. Specifically, the 2019 10-K stated, in relevant part:

Compliance Program

The health care industry is highly regulated and scrutinized with respect to fraud, abusive billing practices and improper financial relationships between health care companies and their referral sources. The Office of the Inspector General of HHS (the "OIG") has published compliance guidance, including the Compliance Program Guidance for Clinical Laboratories in August of 1998, and advisory opinions. The Company has implemented a robust Compliance Program, which is overseen by our Board of Directors. Its objective is to ensure compliance with the myriad of international, federal and state laws, regulations and governmental guidance applicable to our business. Our program consists of the development and implementation of standards of conduct, training/education of employees, monitoring and auditing Company practices, investigation, and response to reported or detected compliance issues. The Board of Directors has formed a Compliance Committee of the Board, which meets regularly to discuss all compliance-related issues that may affect the Company. The Company reviews its policies and procedures as new regulations and interpretations come to light to comply with applicable regulations. The Chief Compliance Officer reports directly to the Compliance Committee.

73.     The 2019 10-K was signed by Defendants VanOort, McKenzie, Tetrault, Crowther, and Hipp pursuant to the Exchange Act. Further, the 2019 10-K contained certifications signed by Defendants VanOort and McKenzie pursuant to the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX"), certifying that they reviewed the 2019 10-K and attesting to the accuracy of the statements contained within the 2019 10-K.

74.     On April 28, 2020, the Company held conference call to discuss NeoGeonomics' first-quarter 2020 financial results (the "1Q 2020 Earnings Call"), during which the Company's officers boasted about NeoGenomics' test offerings. During the 1Q 2020 Earnings Call, Defendant McKenzie stated, in relevant part: "[p]rior to the impacts of COVID-19, we were once again seeing growth across all testing modalities, with particular strength in next-generation sequencing and molecular testing."

75.     On April 29, 2020, the Company filed its quarterly report for the period ended

24

March 31, 2020 (the "1Q 2020 10-Q"). The 1Q 2020 10-Q touted the success of the Company's

testing services, stating, in relevant part:

> We offer a comprehensive suite of technical and interpretation services, to meet the
> needs of those clients who are not credentialed and trained in interpreting genetic
> tests and who require pathology specialists to interpret their testing results. In our
> global service offerings, our lab performs the technical component of the tests and
> our M.D.s and Ph.Ds. provide the service of interpreting the results of those tests.
> Our professional staff is also available for post-test consultative services. Clients
> using our global service offering rely on the expertise of our medical team to give
> them the answers they need in a timely manner to help inform their diagnoses and
> treatment decisions.
>
> We believe we have one of the broadest Molecular and Next Generation
> Sequencing test menus in the world, with approximately 13,300 NGS tests
> completed in the first quarter of 2020. Clients have the ability to order single gene
> molecular tests, targeted NeoTYPE panels that include the relevant actionable
> genes for a particular cancer type as well as large NGS panels. Our Pharma Services
> Division offers a full range of sequencing testing including whole exome
> sequencing. Our menu enables us to be a true one-stop-shop for our clients as we
> can meet all of their oncology testing needs.

76.     The 1Q 2020 10-Q was signed by Defendants VanOort and McKenzie and

contained certifications signed by Defendants VanOort and McKenzie, pursuant to the Exchange

Act and SOX, certifying that they reviewed the 1Q 2020 10-Q and attesting to the accuracy of the

statements contained within the 1Q 2020 10-Q.

77.     On May 26, 2020, the Company issued a press release announcing that

NeoGenomics formed a collaboration with Inivata Limited, which would further expand their suite

of testing services. The press release stated, in relevant part:

> **Fort Myers, Florida (May 26, 2020) - NeoGenomics, Inc. (NASDAQ: NEO)
> (the "Company")**, a leading provider of cancer-focused genetics testing services,
> announced today that it has formed a strategic collaboration with Inivata to
> commercialize the InVisionFirst-Lung liquid biopsy test in the United States.
>
> InVisionFirst-Lung is a ctDNA NGS liquid biopsy assay testing 37 genes relevant
> to the care of advanced non-small cell lung cancer (NSCLC) patients. The test
> covers all National Comprehensive Cancer Network (NCCN) guideline-
> recommended genomic drivers with FDA-approved targeted therapies for NSCLC.

InVisionFirst-Lung results are delivered within seven calendar days from blood draw and the test is covered by Medicare and various private insurance payers for patients with advanced NSCLC meeting certain clinical criteria. . . .

"We are pleased to announce this exciting collaboration with Inivata and to offer our clients a high-quality liquid biopsy alternative for advanced non-small cell lung cancer patients. We expect this test to be an attractive option for clients pursuing liquid biopsy testing, given a highly competitive turn-around time and Medicare coverage" said Douglas M. VanOort, Chairman and CEO of NeoGenomics. "As a leading provider of tissue-based lung cancer testing in the United States, NeoGenomics is well-positioned to commercialize this liquid biopsy test as part of our comprehensive suite of testing solutions for non-small cell lung cancer." . . .

78.    On July 28, 2020, the Company issued a press release announcing its second-quarter 2020 results. The press release stated, in relevant part:

"As expected, second quarter financial results were challenging due to the global COVID-19 crisis, which reduced both revenue and earnings," said Douglas M. VanOort, Chairman and CEO of NeoGenomics.

"Even in the midst of this pandemic, we made several strategic moves and invested in our business. We fortified our balance sheet with a successful offering of both common stock and convertible securities, *we strategically invested in Inivata for access to liquid biopsy and minimal residual disease testing capabilities, we launched a suite of liquid biopsy tests, we moved forward with investments to further globalize our Pharma Services business, and we built and operationalized a high-capacity COVID-19 testing laboratory. We believe these investments will deliver both near-term and long-term growth, and that we exited the second quarter in a stronger competitive position for the future."*

(Emphasis added).

79.    Also on July 28, 2020, the Company held a conference call to discuss the financial results for the second-quarter 2020 (the "2Q 2020 Earnings Call"). During the 2Q 2020 Earnings Call, the Company acknowledged the challenging second-quarter financial results but went on to discuss strategic decisions made by the Company to promote NeoGenomics' "long-term growth." Specifically, Defendant VanOort stated:

We believe that our strategic decision to invest in growth is enhancing our competitive positioning, and will pay dividends in both the near-term and the long-term. In fact, we believe that we are even better positioned for growth than we were

before the pandemic hit. We now have a full suite of liquid biopsy tests which further strengthens our Next Generation Sequencing product portfolio and solidifies our comprehensive oncology test menu. We also have a strong balance sheet to support further M&A. We have a very large backlog of signed Pharma Services contracts and are well positioned for growth with an increasingly global presence. And we are advancing our Informatics initiatives and are very excited about what that team has already accomplished. All and all, we continue to run our business for the long-run and we are looking forward to a bright future.

80.     On July 31, 2020, the Company filed a quarterly report for the period ended June 30, 2020 (the "2Q 2020 10-Q"). The 2Q 2020 10-Q contained identical statements to those contained in the 1Q 2020 10-Q, stating, in relevant part:

We offer a comprehensive suite of technical and interpretation services, to meet the needs of those clients who are not credentialed and trained in interpreting genetic tests and who require pathology specialists to interpret their testing results. In our global service offerings, our lab performs the technical component of the tests and our M.D.s and Ph.Ds. provide the service of interpreting the results of those tests. Our professional staff is also available for post-test consultative services. Clients using our global service offering rely on the expertise of our medical team to give them the answers they need in a timely manner to help inform their diagnoses and treatment decisions.

We believe we have one of the broadest Molecular and Next-Generation Sequencing test menus in the world. Clients have the ability to order single gene molecular tests, targeted NeoTYPE panels that include the relevant actionable genes for a particular cancer type as well as large NGS panels. Our Pharma Services Division offers a full range of sequencing testing including whole exome sequencing. Our menu enables us to be a true "one-stop shop" for our clients as we can meet all of their oncology testing needs.

81.     The 2Q 2020 10-Q was signed by Defendants VanOort and McKenzie. The 2Q 2020 10-Q also contained signed certifications by Defendants VanOort and McKenzie pursuant to the Exchange Act and SOX, certifying that they reviewed the 2Q 2020 10-Q and attesting to the accuracy of the statements contained within the 2Q 2020 10-Q.

82.     On September 14, 2020, the Company participated in the Morgan Stanley Global Healthcare Conference. During this conference, Defendant VanOort again touted the Company's suite of testing services, stating, "[w]e are a one-stop shop for clients, physicians, pathologists,

hospitals and pharmaceutical companies. We use every kind of testing modality that you can use for cancer, including some of the fast-growing new ones, like next-generation sequencing, but we do everything. So we're a one-stop shop."

83.     On October 27, 2020, NeoGenomics issued a press release announcing its third-quarter 2020 financial results. The press release touted the success of the Company, stating, in relevant part:

> "Third quarter results were strong as we bounced back nicely from a challenging second quarter and set new company records for quarterly consolidated revenue and pharma services revenue and backlog. Importantly, test volume in our core clinical oncology business continued to trend higher on what looks to be a V-Shaped recovery and the majority of our pharma clients' clinical trial sites are now open." said Douglas M. VanOort, Chairman and CEO of NeoGenomics.

> We have continued to make strategic investments, even in the midst of the pandemic, to put us in a stronger position for growth. We are particularly excited about our investments in global Pharma Services, Informatics, strategic marketing initiatives, liquid biopsy, including our investment in Inivata, certain research and development priorities, and the on-going construction of our new state-of-the-art laboratory and global headquarters in Fort Myers.

84.     Also on October 27, 2020, the Company held a conference call to discuss the financial results for the third-quarter 2020 (the "3Q 2020 Earnings Call"). During the 3Q 2020 Earnings Call, Defendant VanOort alleged the success of the Company's NGS testing, stating:

> Next Generation Sequencing test volume growth was particularly strong in Quarter Three, growing faster than overall Clinical volume. Test volume growth also improved for this product line as the Quarter progressed. The positive momentum in Next Generation Sequencing testing has continued in October, with daily test volumes approximately 30% higher than last year.

85.     On October 29, 2020, the Company filed the quarterly report for the period ended September 30, 2020 on Form 10-Q with the SEC (the "3Q 2020 10-Q"). The 3Q 2020 10-Q contained identical statements to those referenced in ¶¶ 75 and 80 *supra*, touting the Company's test portfolio.

86.     The 3Q 2020 10-Q was signed by Defendants VanOort and McKenzie. The 3Q 2020 10-Q also contained signed certifications by Defendants VanOort and McKenzie pursuant to the Exchange Act and SOX, certifying that they reviewed the 3Q 2020 10-Q and attesting to the accuracy of the statements contained within the 3Q 2020 10-Q.

87.     On January 11, 2021, the Company participated in the J.P. Morgan Healthcare Conference. During the conference, Defendant VanOort discussed the Company's NGS testing, stating:

> NGS is a technology that allows us to interrogate a number of genes all simultaneously. And there are a lot of different applications for next-generation sequencing. There are small panels and large panels and targeted panels, DNA panels and RNA panels and some with both DNA and RNA. We can use next-generation sequencing for tissue samples or for circulating tumor samples, also referred to as liquid biopsy, and more. And consistent with NeoGenomics' comprehensive approach to our test menu, we also offer a wide variety of and range of next-generation sequencing tests. And this is one of the things that differentiates NeoGenomics. And we believe that we have a very high quality capability to meet the needs of nearly any client. . . .

88.     On February 24, 2021, the Company issued a press release announcing its fourth-quarter and full-year 2020 financial results. The press release again asserted the success of NeoGenomics, stating, in relevant part:

> Douglas M. VanOort, the company's Chairman and CEO said "2020 was a remarkable year for NeoGenomics, and one that obviously no one could have prepared for or anticipated. We are proud of the outstanding NeoGenomics team for responding and excelling in this most challenging environment. They never wavered from delivering high-quality results for the physicians and patients we serve.
>
> We are also proud of our financial performance, as Fourth Quarter revenue increased 18% year-over-year to a record $126 million. For the first time since the pandemic began, we saw year-over-year growth in all of our core divisions. As the pandemic subsides, we believe that growth will recover steadily back to our longer-term growth targets, and we remain highly confident in the strength of our core oncology business and long-term growth opportunities. . . .

**Fourth-Quarter Results**

Consolidated revenue for the fourth quarter of 2020 was $126 million, an increase of 18% over the same period in 2019. Clinical Services revenue increased year-over-year by 14% to $107 million, primarily driven by COVID-19 Polymerase Chain Reaction ("PCR") testing revenue of $9 million. Clinical test volume increased by 5% year-over-year. Average revenue per clinical test ("revenue per test") was flat at $369 when compared to the fourth quarter of 2019. Pharma Services revenue grew by 43% to $19 million compared to the fourth quarter of 2019, primarily driven by an increase in research and informatics.

Gross profit increased by $7.5 million, or 15.1%, compared to the fourth quarter of 2019, to $57.5 million. This increase was the result of higher test volume.

Operating expenses increased by $4 million, or 9%, compared to the fourth quarter of 2019, reflecting investments in informatics, growth initiatives and costs associated with the integration of HLI-Oncology.

Net income for the fourth quarter was $15 million compared to $6 million in the fourth quarter of 2019.

Adjusted EBITDA was $18 million compared to $14 million in the fourth quarter of 2019. Adjusted Net Income was $17 million compared to $11 million in the fourth quarter of 2019.

Cash and cash equivalents, including restricted cash, was $251 million and short-term marketable securities were $68 million. Days sales outstanding ("DSO") was 78 days at the end of the fourth quarter of 2020.

**Full-Year Results**

Consolidated revenue for 2020 was $444 million, an increase of 9% over 2019. This increase was primarily driven by COVID-19 PCR testing revenue of approximately $28 million and growth in our Pharma Services segment. Net income for 2020 was $4 million compared to net income of $8 million in 2019. Adjusted EBITDA(2) for 2020 was $35 million compared to $57 million in 2019. Adjusted Net Income(2) for 2020 was $17 million compared to $32 million in 2019.

89.    The February 24, 2021 press release also announced the retirement of Defendant VanOort as CEO.

90.    The Company also hosted a conference call on February 24, 2021, discussing the financial results for the fourth-quarter 2020 (the "Q4 2020 Earnings Call"). During the Q4 2020 Earnings Call, Defendants McKenzie and VanOort discussed the success of the Company's NGS

testing. Defendant VanOort stated, "[o]ur Clinical division grew core oncology revenue 5% year over year in Quarter 4 driven by Next Generation Sequencing volume growth of 23%." Additionally, Defendant McKenzie sated, "[t]he favorable product mix is driven by Next Generation Sequencing and FISH testing services which are growing at much higher relative rates."

91.     On February 25, 2021, the Company filed its annual report for the fiscal year 2020 on Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K touted the success of the Company's testing services, stating, in relevant part:

> Our plans for 2021 include initiatives to continue to drive sustainable growth and innovation. We will continue to pursue market share gains by providing high complexity, cancer-related laboratory testing services to hospitals, community-based pathology and oncology practices, academic centers, clinicians, and pharmaceutical companies. Additionally, we will focus on continued reimbursement effectiveness through improving coverage, streamlining processes and providing clients more efficient, automated ordering methods, which we believe will continue to fuel our growth and market share.

> Our laboratory and informatics teams will continue focus on new assays and product offerings, including liquid biopsy, MRD and other high-quality tests. We expect this to enhance our strategic position while enabling us to maintain our high levels of client retention.

> Our broad and innovative test menu of molecular, including NGS, immunohistochemistry, and other testing has helped make us a "one-stop shop" for many clients who value that all of their testing can be sent to one laboratory. We will continue to look for growth opportunities through mergers and/or acquisitions and are focused on strategic opportunities that would be complementary to our menu of services and would increase our earnings and cash flow in the short to medium time frame. We are also focused on investing in business development and informatics capabilities to partner with our key stakeholders, including patients, providers, payers and pharmaceutical companies to provide solutions to current or near-term problems that they face.

92.     The 2020 10-K also discussed the compliance measures the Company has in place, stating:

**Compliance and Ethics Program**

The health care industry is highly regulated and scrutinized with respect to fraud, abusive billing practices and improper financial relationships between health care companies and their referral sources. The U.S. Department of Justice ("DOJ") and the Office of the Inspector General of HHS ("OIG") has published compliance program guidance, including the Compliance Program Guidance for Clinical Laboratories in August of 1998, fraud alerts and advisory opinions. The Company has implemented a robust Compliance & Ethics Program encompassing this guidance, which is overseen by our Board of Directors, to ensure compliance with the myriad of international, federal and state laws, regulations and governmental guidance applicable to our business. Our program employs a risk-based approach to the development and implementation of standards of conduct, training/education of employees, monitoring and auditing Company practices, investigation, and response to reported or detected compliance issues. The Company provides a hotline for employees who wish to anonymously or confidentially report suspected violations of our codes of conduct, policies/procedures, or laws and regulations. Employees are strongly encouraged to report any suspected violation if they do not feel the problem can be appropriately addressed through the normal chain of command. The hotline does not replace other resources available to our employees, including supervisors, managers and human resources staff, but is an alternative channel available 24 hours a day, 365 days a year. The hotline forwards all reports to the Chief Compliance Officer who is responsible for investigating, reporting to the Compliance Committee, and documenting the disposition of each report. The hotline forwards any calls pertaining to the financial statements or financial issues to the Chairman of the Audit Committee. The Company does not allow any retaliation against an employee who reports a compliance related issue in good faith.

The Board of Directors has a Compliance Committee of the Board, which meets regularly to discuss all compliance-related issues that may affect the Company. The Company reviews its policies and procedures as new regulations and interpretations come to light to comply with applicable regulations. The Chief Compliance Officer reports quarterly to the Compliance Committee on the effectiveness of the program.

93.     The 2020 10-K was signed by Defendants VanOort, McKenzie, Tetrault, Crowther, Kelly, Stahler, Hipp, and Jones pursuant to the Exchange Act. Further, the 2020 10-K contained certifications signed by Defendants VanOort and McKenzie pursuant to the Exchange Act and SOX, certifying that they reviewed the 2020 10-K and attesting to the accuracy of the statements contained within the 2020 10-K.

94.     On May 27, 2021, NeoGenomics held its Annual Shareholders Meeting. During the

meeting, Defendant Mallon touted the success of the Company's suite of testing services to the investors. Specifically, Defendant Mallon stated:

> Another core strength is the breadth of our Test Menu. We cover all of the key modalities in cancer testing. As I mentioned, over 700 tests and this includes the fastest growing, which is the molecular test, where we bring – have a unique position, where we actually try to customize the types of molecular tests, the panels, the number of mutations to be tested and not just molecular, but also adding in the necessary additional modalities to really get the most precise, customized, cost-effective solution for a particular cancer or a particular patient.

95.    On June 9, 2021, the Company participated in the Goldman Sachs Global Healthcare Conference. At the conference, Defendant VanOort stated "we have the most comprehensive test menu that anyone has for oncology out there." Defendant VanOort went on to discuss the Company's robust testing portfolio, stating, "[o]ne of the things that is quite unique and a competitive advantage is we are a go-to reference lab with a comprehensive menu for just about any kind of tests you want to have done in cancer. . . . [a]nd so we have been a go-to one-stop shop reference lab for a lot of players in the ecosystem, and we keep our test menu very advanced."

96.    On August 6, 2021, the Company issued a press release announcing the financial results for the second-quarter 2021. The press release reported financial success, stating, in relevant part:

> "Second-quarter results were strong as all three of our divisions grew significantly year-over-year. Importantly, our core cancer businesses showed meaningful signs of recovery as our clinical business processed record oncology volumes and Pharma Services posted record revenues." said Mark Mallon, CEO of NeoGenomics. "We also strengthened our strategic position considerably during the quarter, closing on the acquisitions of Trapelo Health in April and Inivata in June. Both acquisitions bring important capabilities to NeoGenomics that we believe can accelerate our growth in the years to come."

**<u>Second-Quarter Results</u>**

Consolidated revenue for the second quarter of 2021 was $122 million, an increase

of 40% over the same period in 2020. Clinical Services revenue of $101 million was an increase year-over-year of 37% and an increase over the first quarter of 2021 of 5%. Excluding COVID-19 PCR testing, Clinical Services revenue was an increase year-over-year of 41% and an increase over the first quarter of 2021 of 7%. Clinical test volume increased by 37% year-over-year. Average revenue per clinical test ("revenue per test") increased by 3% to $360. Pharma Services revenue increased by 55% to $20 million compared to the second quarter of 2020, primarily due to an increase in revenue related to clinical trials and informatics.

Consolidated gross profit for the second quarter of 2021 was $53 million, an increase of 89.2%, compared to the second quarter of 2020. This increase was a result of the combined effect of higher test volume and recovery from the COVID-19 pandemic in both segments. Consolidated gross profit margin including amortization of acquired intangible assets was 43.5%. Adjusted Gross Profit Margin excluding amortization of acquired intangible assets was 44.1%.

Operating expenses increased by $28 million, or 61%, compared to the second quarter of 2020, which includes $11 million of acquisition and integration costs, Inivata and Trapelo Health operating expenses following their respective acquisition dates, and higher payroll and payroll-related costs to support the Company's near and long-term growth.

Net income for the quarter was $76 million compared to net loss of $7 million for the second quarter of 2020, which includes a $97 million gain on the Company's prior investment in and loan receivable from non-consolidated affiliate due to the acquisition of Inivata Limited, a private limited company incorporated in England and Wales. Net loss for the quarter excluding this gain was $21 million.

97.     Also on August 6, 2021, NeoGenomics held a conference call to discuss its second-quarter 2021 financial results (the "2Q 2021 Earnings Call"). The 2Q 2021 Earnings Call included statements from Defendant Mallon, which touted the success of the Company's testing services. Defendant Mallon stated, in relevant part:

From a big picture perspective, I have been very impressed by several strengths of Neo in my first 100 days on the job. First is just how comprehensive our oncology platform at NeoGenomics truly is. As I have dug in, I see how our broad portfolio of services provides a value proposition for all of the constituents in the oncology ecosystem – providers, pharma, payors, and of course, patients. Our portfolio of multi-modality solutions is comprised of hundreds of assays that provide time sensitive biomarker specific answers for Oncologists, Pathologists, research scientists, and pharma trials teams. Our customized targeted panels allow us to provide the right information at the right time for providers and patients and at the right price for our direct bill and third party payors. And that broad based menu that

differentiates us in clinical is also of great value to biopharma customers and is the real driver of growth for us. As we test nearly 500,000 patients per year, the value of the data and related informatics capabilities we are gathering only continues to snowball every day.

Critically, these strengths have translated into leadership in three key franchises. We are the clear leader in diagnosis of hematologic cancers with an especially strong position, and have strong franchises in both the breast and lung segments, where we run more than 100,000 tests annually in each. These are real platforms for growth today and in the future. . . .

And I know we can do much more. We believe that commercialization of the RaDaR assay can help transform the cancer care paradigm for millions of patients in need of cancer recurrence monitoring. We see opportunity to drive broad adoption of a leading clinical decision software for our oncology customers to help them navigate appropriate testing for their patients from both a technology and cost/benefit perspective. And while we are a leader in the U.S. oncology market, I see so much opportunity outside the U.S. as we look to further globalize our offerings.

We have multiple facilities around the world that have ample capacity to scale and we have ongoing discussions with various biopharma companies regarding our ability to further support them globally. Along with these organic growth opportunities right in front of us, we also have corporate development and inorganic growth opportunities that we have no intention of slowing down on. We are strategically well positioned and are wellcapitalized for further deal making as we will look to keep pace with the constantly changing and highly competitive marketplace in oncology.

When I put it all together, I see a very well positioned, very well diversified player in one of the most attractive end markets in the world. And I believe all the opportunity in front us puts us in a position to accelerate our historical mid-teens topline growth rate over time, which will enhance our margins as well as we fill up our laboratories and continue to implement efficiencies. . . .

98.     On August 9, 2021, the Company filed its quarterly report for the period ended June 30, 2021 on Form 10-Q (the "2Q 2021 10-Q"). The 2Q 2021 10-Q contained identical statements to those referenced in ¶¶ 75, 80, and 85 *supra*, touting the Company's test portfolio. The 2Q 2021 10-Q also boasted that the Company was able to decrease the average cost per test and increase the volume of tests, partially due to the "fixed nature of many of [the Company's] laboratory costs."

99.     The statements identified above were materially false and misleading when made and failed to disclose material adverse facts about the Company's business, operations, and prospects. The Individual Defendants caused and/or permitted NeoGenomics to conceal : (i) that the Company was not actually a "one-stop-shop" for its customers because the market was shifting away from the testing panels they offered and customers were seeking more comprehensive panels; (ii) the Company's lab costs were not actually of a "fixed nature" because the Company would need to adapt their offerings and invest more money into different tests to accommodate their customers as the testing market shifted; (iii) that there were material weaknesses in the Company's internal controls because the Company did not actually have sufficient compliance measures in place; and (iv) that, as a result of the foregoing, the Company's positive statements about its business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

***The Truth Emerges***

100.     The truth began to emerge on November 4, 2021, when the Company, during the 3Q 2021 Earnings Call, revealed that NeoGenomics was conducting an internal investigation. Specifically, Defendant McKenzie revealed:

> Our Balance Sheet also includes an accrual for a compliance item that will be disclosed in the 10Q that we expect to be filed later today. ***We are voluntarily conducting an internal investigation, with the assistance of outside counsel, that focuses on the compliance of certain consulting and service agreements with federal healthcare laws and regulations.***
>
> Based on preliminary findings of this internal investigation, we voluntarily notified the Office of Inspector General of the U.S. Department of Health and Human Services of our investigation in November 2021. Though our review of this matter is ongoing, we have accrued a reserve of $10.5 million for potential damages and liabilities associated with the federal healthcare program revenue received spanning multiple years in connection with the agreements at issue that were identified during the course of this internal investigation.

(Emphasis added).

101.    On this news, NeoGenomics' stock price dropped $8.18 per share, or approximately 17.6%, to close at $38.35 per share on November 4, 2021.

102.    Following the close of the market on November 4, 2021, NeoGenomics filed the quarterly report for the period ended September 30, 2021 on Form 10-Q with the SEC (the "3Q 2021 10-Q"). The 3Q 2021 10-Q again discussed the internal investigation, stating:

> **With the assistance of outside counsel, the Company is voluntarily conducting an internal investigation that focuses on the compliance of certain consulting and service agreements with federal healthcare laws and regulations, including those relating to fraud, waste and abuse.** Based on this internal investigation, the Company voluntarily notified the Office of Inspector General of the U.S. Department of Health and Human Services ("OIG") of the Company's internal investigation in November 2021. **The Company's review of this matter is ongoing. As of September 30, 2021, the Company has accrued a reserve of $10.5 million in other long-term liabilities on the Consolidated Balance Sheets for potential damages and liabilities primarily associated with the federal healthcare program revenue received by the Company in connection with the agreements at issue that were identified during the course of this internal investigation. This reserve reflects management's best estimate of the minimum probable loss associated with this matter.** As a result of the ongoing investigation and interactions with regulatory authorities, the Company may accrue additional reserves for any related potential damages and liabilities arising out of this matter. At this time, the Company is unable to predict the duration, scope, result or related costs associated with any further investigation, including by the OIG, or any other governmental authority, or what penalties or remedial actions they may seek. Accordingly, at this time, the Company is unable to estimate a range of possible loss in excess of the amount reserved. Any determination that the Company's operations or activities are not in compliance with existing laws or regulations, however, could result in the imposition of civil or criminal fines, penalties, disgorgement, restitution, equitable relief, or other losses or conduct restrictions, which could be material to the Company's financial results or business operations.

(Emphasis added).

103.    However, following this news, the Individual Defendants caused the Company to continue to misrepresent the success of NeoGenomics. For example, on February 25, 2022, when the Company filed its annual report for the fiscal year 2021 on Form 10-K with the SEC (the "2021 10-K"), the Company continued to tout the success of NeoGenomics' portfolio of tests and their

compliance program. Specifically, the 2021 10-K stated, among other things:

Innovative Service Offerings

We believe we currently have the most extensive menu of tech-only FISH services in the country as well as extensive and advanced tech-only flow cytometry and IHC testing services. These types of testing services allow the professional interpretation component of a test to be performed and billed separately by our physician clients. Our tech-only services are designed to give pathologists the option to choose, on a case by case basis, whether they want to order just the technical information and images relating to a specific test so they can perform the professional interpretation, or order "global" services and receive a comprehensive test report which includes a NeoGenomics pathologist's interpretation of the test results. Our clients appreciate the flexibility to access NeoGenomics' medical staff for difficult or complex cases or when they are otherwise unavailable to perform professional interpretations.

We offer a comprehensive suite of technical and interpretation services, to meet the needs of those clients who are not credentialed and trained in interpreting genetic tests and who require pathology specialists to interpret their testing results. In our global service offerings, our lab performs the technical component of the tests and our MDs and PhDs provide the service of interpreting the results of those tests. Our professional staff is also available for post-test consultative services. Clients using our global service offering rely on the expertise of our medical team to give them the answers they need in a timely manner to help inform their diagnoses and treatment decisions.

We believe we have one of the broadest Molecular and NGS test menus in the world. Clients have the ability to order single gene molecular tests, targeted NeoTYPE panels that include the relevant actionable genes for a particular cancer type as well as large NGS panels. Our Pharma Services segment offers a full range of sequencing testing including whole exome and whole genome sequencing. Our menu enables us to be a true "one-stop shop" for our clients as we can meet all of their oncology testing needs.

104.     The 2021 10-K was signed by Defendants Mallon, Bonello, Tetrault, Crowther, Kelly, and Stahler, pursuant to the Exchange Act. Further, the 2020 10-K contained certifications signed by Defendants Mallon and Bonello pursuant to the Exchange Act and SOX, certifying that they reviewed the 2021 10-K and attesting to the accuracy of the statements contained within the 2021 10-K.

105.     Then, on March 28, 2022, the truth continued to emerge as the Company issued a

press release disclosing that Defendant Mallon would be resigning as CEO and as a member of the

Board and announcing its expected financial results. The press release stated, in relevant part:

> **Ft. Myers, Florida—March 28, 2022 / NeoGenomics, Inc. (NASDAQ:NEO) (the "Company"**), a leading provider of cancer-focused genetic testing services and global oncology contract research services, today announced that the Board of Directors (the "Board") and Mark Mallon, Chief Executive Officer, have agreed that Mr. Mallon will step down as CEO and member of the Board, effective immediately. This mutual agreement was not the result of any disagreements about strategy with management or the Board, inappropriate action by CEO, or any violation of company policy or any accounting irregularity. The Board has retained Russell Reynolds to conduct a search for the Company's next CEO. . . .
>
> Lynn Tetrault, Executive Chair of NeoGenomics said, "We thank Mark for his contributions to the Company and wish him the best in the future. We are taking immediate steps to improve our business performance. We remain committed to our strategy and the creation of long-term value for our shareholders. We're fortunate to have an experienced and highly capable senior management team to continue leading the company. I look forward to working closely with them as we recruit a new Chief Executive Officer."

106.    The March 28, 2022 press release also stated that:

> The Company currently expects revenue for Q1 2022 may be below the low end of its prior guidance of $118 - $120 million and EBITDA for Q1 2022 will be below the low end of its prior guidance of $(15) - $(12) million. The larger than anticipated EBITDA loss was primarily driven by higher than anticipated Clinical Services cost of goods sold. The Company intends to take immediate action to address performance and costs while continuing to invest prudently in the RaDaR™ Assay. The Company plans to report full Q1 2022 results on April 27, 2022. Additionally, the Company has withdrawn its 2022 annual financial guidance issued February 23, 2022.

107.    On this news of Defendant Mallon's resignation and the anticipated disappointing

financial results for the first quarter of 2022, the Company's stock price dropped $5.30 per share,

or approximately 29.8%, to close at $12.49 per share on March 29, 2022.

108.    On April 27, 2022, NeoGenomics issued a press release, announcing its first-

quarter 2022 financial results. The press release revealed the disappointing financial results,

stating:

Consolidated revenue for the first quarter of 2022 was $117 million, an increase of 1% over the same period in 2021. Clinical Services revenue of $99 million was an increase year-over-year of 2%. Excluding 2021 COVID-19 PCR testing, Clinical Services revenue increased by 4% year-over-year. Clinical test volume increased by 2% year-over-year. Average revenue per clinical test ("revenue per test") increased by 2% to $371. Pharma Services revenue decreased by 4% to $18 million compared to the first quarter of 2021.

***Consolidated gross profit for the first quarter of 2022 was $38.2 million, a decrease of 8.0% compared to the first quarter of 2021.*** This decrease was primarily due to the amortization of acquired Inivata developed technology intangibles and higher payroll and payroll-related costs, partially offset by the increase in revenue. Consolidated gross profit margin, including amortization of acquired Inivata developed technology intangible assets, was 32.6%. Adjusted Gross Profit Margin, excluding amortization of acquired Inivata developed technology intangible assets, was 36.8%.

***Operating expenses increased by $34 million, or 59%, compared to the first quarter of 2021, and included significant operating expenses for the Inivata and Trapelo Health subsidiaries which were acquired in the second quarter of 2021.*** Operating expenses in the first quarter of 2022 also included higher non-cash stock based compensation expenses, higher payroll and payroll-related costs to support the Company's strategic growth initiatives, and an increase in professional fees.

***Net loss for the quarter was $49 million compared to net loss of $22 million for the first quarter of 2021.***

***Adjusted EBITDA was negative $19 million compared to positive $4 million in the first quarter of 2021. Adjusted net loss(2) was $25 million compared to Adjusted net loss(2) of $5 million in the first quarter of 2021.***

Cash and cash equivalents and marketable securities totaled $481 million at quarter end.

(Emphasis added).

109.    Following the issuance of the April 27, 2022 press release, the Company held a conference call to discuss its first-quarter 2022 financial results (the "1Q 2022 Earnings Call"). During the 1Q 2022 Earnings Call, Defendant Tetrault stated, among other things:

Unfortunately, our performance over the past year has been inconsistent with that historical track record, as evidenced by slowing growth and decreased profitability. The company experienced a number of challenges in 2021, including the transition of our longstanding Chairman and Chief Executive Officer, Doug Van Oort,

continuing headwinds from COVID and shifting dynamics in the external environment. Though the company's market position remains strong, and our overall strategy is sound, our execution over the last year was poor. The Board of Directors took decisive action last month to change leadership in order to restore the operational performance of the business and better position the company for long-term success.

110.    Defendant Bonello discussed some of the driving factors that resulted in the decreased volume of NeoGenomics' business during the 1Q 2022 Earnings Call. Specifically, Defendant Bonello stated:

Our volume growth is being impacted by a couple factors. First, our test mix is weighted to legacy modalities and disease-specific NGS offerings while the market is moving towards larger, more comprehensive panels. Second, operational challenges have made it difficult to add new business at our historical rates. We are taking a number of steps toupgrade our NGS product offering and improve our lab operations, which Shashi and Dave will discuss in greater detail later in the call. . . .

111.    Further, Defendant Bonello discussed the decline in the Company's profits during the 1Q 2022 Earnings Call, stating:

Our GAAP Gross Margin was 32.6%. Adjusted Gross Margin, which excludes Inivata related non-cash amortization expense, was 36.8%. Adjusted Gross Margin declined 380 basis points year over year and 310 basis points sequentially.

There are several factors that contributed to the decline in Adjusted Gross Margin and we are taking immediate action to mitigate these trends.

First, in late 2021, we significantly increased the size of our laboratory workforce in preparation for a return to pre-COVID growth rates. As noted earlier, volume growth did not rebound to the extent that we had expected. As a result, we have significantly scaled back our laboratory hiring plans to better align with near-term volume trends.

Second, like most companies, we have experienced significant wage and supply cost inflation. In response to this cost pressure, we are implementing price increases in both our Clinical and Pharma businesses and pursuing strategic reimbursement opportunities to increase value capture for the services that we are providing.

Third, we did have extra-cost associated with the transition to our new Ft. Myers lab. While this move will drive productivity and efficiency improvements over time, we did incur extra costs related to operating two different Fort Myers labs

during the transition. We expect this transition to conclude over the next couple months.

In addition to these factors, we have seen a notable decrease in lab efficiency over the course of the past year. This decrease is largely attributable to increased complexity of both our product offerings and our lab processes due in part to efforts to respond to customer requests for customization. We are already taking action to significantly reduce this complexity. These actions include eliminating low margin services, streamlining our NGS processes to drive reductions in labor, supplies and bioinformatics cost while simultaneously improving turn-around time, and implementing AI to substantially increase lab tech productivity. We estimate that these actions plus our pricing actions could contribute at least $15 million of annualized gross profit once fully implemented. Moreover, we have every expectation that we will identify additional near-term actions as we continue to engage the organization.

Finally, as we have discussed in the past, our pharma lab expansions, including both our international labs and our La Jolla facility, continue to be a significant drag on Adjusted Gross Margin. While our international labs are important to our long-term growth strategy and allow us to bid on larger, global clinical trials, these international labs are operating well below capacity. Our La Jolla lab, which we acquired through the acquisition of the oncology assets of Human Longevity in 2020, and which is where we perform whole exome and whole genome sequencing, is also operating below capacity. While lab expansion remains an important component of our Pharma Growth strategy, we are working to better align capacity expansion with growth.

112.    On this news, the Company's common stock dropped $0.31 per share, or approximately 3.8%, to close at $10.44 per share on April 27, 2022.

113.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the costs of defending itself in the Securities Action, exposure to class-wide liability in the Securities Action, as well as additional losses, including reputational harm and loss of goodwill.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

114.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

115.    NeoGenomics is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

116.    Plaintiff is a current shareholder of NeoGenomics and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

117.    A pre-suit demand on the Board is futile and, therefore, excused. During the illegal and wrongful course of conduct at the Company, the Board consisted of Defendants Tetrault, Hannah, Crowther, Kelly, Stahler, Kanovsky, Daly, Johnson, Hipp, and Jones.

118.    At the time this action was commenced, the seven-person Board was comprised of Defendants Tetrault, Hannah, Crowther, Kelly, Stahler, and Kanovsky (the "Director Defendants") and non-party David Perez ("Perez"), who joined the Board in November 2022. Plaintiff did not make any demand on the Board to institute this action because such a demand would be futile, wasteful, and useless act, as set forth below.

119.    Given the factual allegations set forth herein, Plaintiff has not made a demand on the Board to bring this action against the Director Defendants. A pre-suit demand on the Board would be futile as there is a reason to doubt that a majority of the members of the Board are capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action. As set forth herein, Plaintiff has adequately alleged that there is reason to doubt that the seven current directors of NeoGenomics are capable of disinterestedly and independently considering a demand to initiate and vigorously prosecute this action.

120.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith

effort to prevent or remedy that situation.

121.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence, disregarded the wrongs complained of herein, and are, therefore, not disinterested parties.

122.    For instance, the Director Defendants approved the Separation Agreement between the Company and Defendant Mallon, allowing Defendant Mallon to be compensated generously by the Company upon his termination, despite Defendant Mallon's part in the wrongdoing.

123.    Each of the Director Defendants authorized and/or permitted false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute sch a suit even if they instituted it.

124.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## COUNT I

### Against the Individual Defendants for Violations of § 10(b)
### of the Exchange Act and Rule 10b-5

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

127.    The Individual Defendants, individually and in concert, directly or indirectly,

disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

128.    The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of NeoGenomics common stock.

129.    The Individual Defendants acted with scienter because they (a) knew that the public documents and statements issued or disseminated in the name of NeoGenomics were materially false and misleading; (b) knew that such statements or documents would be issued or disseminated to the investing public; and (c) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

130.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of NeoGenomics, their control over, and/or receipt and/or modification of NeoGenomics' allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning NeoGenomics, participated in the fraudulent scheme alleged herein.

131.    As a result of the foregoing, the market price of NeoGenomics common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements,

shareholders, including Plaintiff, relied on the statements described above and/or the integrity of the market price of NeoGenomics common stock in purchasing NeoGenomics common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

132.   In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. The Individual Defendants, through their violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

## COUNT II

### Against the Individual Defendants
### for Breach of Fiduciary Duty

133.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134.   The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

135.   The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

136.   The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be

disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

137.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

138.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

139.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

141.    Plaintiff on behalf of NeoGenomics has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants
### for Unjust Enrichment

142.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, NeoGenomics.

144.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from NeoGenomics that was tied to the performance or artificially inflated valuation of NeoGenomics, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

145.    Plaintiff, as a shareholder and a representative of NeoGenomics, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

146.    Plaintiff on behalf of NeoGenomics has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants
### for Waste of Corporate Assets

147.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted

in continuous, connected, and ongoing harm to the Company.

149.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (a) paying and colleting excessive compensation and bonuses, including the 1,550,000 paid to Defendant Mallon pursuant to the Separation Agreement; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Action.

150.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

151.    Plaintiff on behalf NeoGenomics has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: July 10, 2023

**RIGRODSKY LAW, P.A.**

By:  */s/ Timothy J. MacFall*
     Seth D. Rigrodsky
     Timothy J. MacFall
     Gina M. Serra
     Vincent A. Licata
     825 East Gate Boulevard, Suite 300

**OF COUNSEL:**
     Garden City, NY 11530
     Telephone: (516) 683-3516

**ROSCA SCARLATO LLC**
     Email: sdr@rl-legal.com
Alan L. Rosca
     Email: tjm@rl-legal.com
2000 Auburn Drive, Suite 200
     Email: gms@rl-legal.com
Beachwood, OH 44122
     Email: vl@rl-legal.com
Telephone: (216) 946-7070
Email: arosca@rscounsel.law
     *Attorneys for Plaintiff*